BANKRUPTCY COURT OF THE UNITED STATES
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------- X



IN RE SUZAN ROBERTA ABBOTT  CASE No. 09 37125-
cgm

Chapter 7
------------------------------------------------- X

## AFFIDAVIT IN SUPPORT OF MOTION TO CERTIFY QUESTIONS STAY SEPTEMBER 22, 2009

I, the undersigned being duly sworn depose and state that I am the cross claimant in this matter, and I do hereby certify that the statements and allegations set forth in the foregoing Motion are true and accurate to the best of my knowledge and belief.

1. I am in peaceful possession of my property and I am informed and believe that the so called mortgage was assigned to Mortgage Electronic Services when the note was issued.

2. Attached to this affidavit as exhibit 1 is a true copy of the case of Landmark National Bank v Kessler, which is requested to be judicially notice and considered in this within cause as an additional basis for the estoppel claimed.

3. There is no known opposition to the granting of applicants prior requests.

3

4. I am informed and believe that certification of the questions are in the public interest.

5. At no time material to this matter has AURORA LOAN SERVICES LLC or its counsel disputed any material fact set out in prior motions

6. I am entitled to the relief requested.

7. I believe that the court may grant the relief requested and should do so forthwith or dismiss the cause as requested.

September 22, 2009

_____
SUZAN R. ABBOTT

I certify under the penalty of perjury that the forgoing is true and correct to the best of my knowledge, information and belief.

_____
SUZAN R. ABBOTT

4

BANKRUPTCY COURT OF THE UNITED STATES
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------- X



IN RE SUZAN ROBERTA ABBOTT   CASE No. 09 37125- cgm

Chapter 7
---------------------------------------------- X

**NOTICE OF HEARING AND MOTION TO CERTIFY QUESTIONS SEPTEMBER 22, 2009, with SUPPLEMENTAL JUDICIAL NOTICE REQUESTED OF A DECISION RENDERD IN *Landmark National Bank v. Kesler*, 2009 Kan. LEXIS 834 Appeal NO. 98,489**

TO THE CLERK AND THE PARTIES, APPLICANT HEREIN, SUZAN R. ABBOTT, will move and hereby does move this Court for entry of order or orders that will certify the questions to the United States District Court and to take supplemental judicial notice as previously requested:

Questions concerning whether the United States has a material interest, whether it is a necessary and indispensable party who must be joined; whether AURORA LOAN SERVICES LLC is a real party in interest as required by Federal Rule of Civil procedure Rule 17(a) and whether the creation of an assignment to Mortgage Electronic Registration Services as a purported nominee as done on initiation of the purportedly valid note establishes a "splitting of the note" and thereby, renders the so called assignment from MERS et al., as void or voidable from incepting implicating various provisions of the National Banking Act, the Truth in Lending Acts and other State statutes operate as a basis for estoppel?

1

In the case of Landmark National Bank v. Kessler, the Kansas Court of Appeals opined that:

> "By statute, assignment of the mortgage carries with it the assignment of the debt. . . . Indeed, in the event that a mortgage loan somehow separates interests of the note and the deed of trust, with the deed of trust lying with some independent entity, the mortgage may become unenforceable. *The practical effect of splitting the deed of trust from the promissory note is to make it impossible for the holder of the note to foreclose*, unless the holder of the deed of trust is the agent of the holder of the note. Without the agency relationship, the person holding only the note lacks the power to foreclose in the event of default. The person holding only the deed of trust will never experience default because only the holder of the note is entitled to payment of the underlying obligation. *The mortgage loan becomes ineffectual when the note holder did not also hold the deed of trust*." [Citations omitted; emphasis added.]

This decision may aid the court in its decision making process and it is therefore, requested that this court consider and certifying the questions.

This certification involves important questions of law that will affect the outcome and are probably determinative of the matter and is suggested to operate as additional cause to extend the stay in this matter.

## Conclusion

The court should liberally construe this pro se pleading and grant the same and other relief it deems appropriate.

Respectfully Submitted,

*[signature]*
Suzan R. Abbott

**Exhibit 1**

No. 98,489



IN THE COURT OF APPEALS OF THE STATE OF KANSAS

LANDMARK NATIONAL BANK,

*Plaintiff/Appellee,*

v.

BOYD A. KESLER,

*Appellee/Cross-Appellant,*

MILLENNIA MORTGAGE CORP.,

*Defendant,*

MORTGAGE ELECTRONIC REGISTRATION

SYSTEMS, INC. AND SOVEREIGN BANK,

*Appellants/Cross-Appellees,*

and

DENNIS BRISTOW AND TONY WOYDZIAK,

*Intervenors/Appellees.*

SYLLABUS BY THE COURT

1. A party is not contingently necessary in a mortgage-foreclosure lawsuit when that party is called the mortgagee in a mortgage but is not the lender, has no right to the repayment of the underlying debt, and has no role in handling mortgage payments.

2. In a mortgage-foreclosure lawsuit, a district court does not abuse its discretion when it denies a motion to intervene that is filed by an unrecorded mortgage holder or its agent after the mortgage has been foreclosed and the property has been sold.

Appeal from Ford District Court; E. LEIGH HOOD, judge. Opinion filed September 12, 2008. Affirmed.

*Tyson C. Langhofer* and *Court T. Kennedy*, of Stinson Morrison Hecker, L.L.P., of Wichita, for appellants/cross-appellees.

*Ted E. Knopp*, of Ted E. Knopp, Chartered, of Wichita, for appellee/cross-appellant Boyd A. Kesler.

*Ted E. Knopp*, of Ted E. Knopp, Chartered, of Wichita, for intervenors/appellees Dennis Bristow and Tony Woydziak.

Before GREENE, P.J., MARQUARDT and LEBEN, JJ.

LEBEN, J.: Landmark National Bank brought a suit to foreclose its mortgage against Boyd Kesler and joined Millennia Mortgage Corp. as a defendant because a second mortgage had been filed of record for a loan between Kesler and Millennia. In a foreclosure suit, it is normal practice to name as defendants all parties who may claim a lien against the property. When neither Kesler nor Millennia responded to the suit, the district court gave Landmark a default judgment, entered a journal entry foreclosing Landmark's mortgage, and ordered the property sold so that sale proceeds could be applied to pay Landmark's mortgage.

But Millennia apparently had sold its mortgage to another party and no longer had interest in the property by this time. Sovereign Bank filed a motion to set aside the judgment and asserted that it now held the title to Kesler's obligation to pay the debt to Millennia. And another party, Mortgage Electronic Registration Systems, Inc. ("MERS"), also filed a motion to set aside the judgment and asserted that it held legal title to the mortgage, originally on behalf of Millennia and later on behalf of Sovereign. Both Sovereign and MERS claim that MERS was a necessary party to the foreclosure lawsuit and that the judgment must be set aside because MERS wasn't included on the foreclosure suit as a defendant.

The district court refused to set aside its judgment. The court found that MERS was not a necessary party and that Sovereign had not sufficiently demonstrated its interest in the property to justify setting aside the foreclosure.

I. *The District Court Properly Refused to Set Aside the Foreclosure Judgment Because MERS Was Not a Necessary Party.*

To resolve these claims, we will review some basic concepts of mortgages and foreclosure proceedings. We must pay close attention not only to the terms given to the parties in carefully crafted documents but also to the roles each party actually performed. No matter the nomenclature, the true role of a party shapes the application of legal principles in this case.

A mortgage grants a title or lien against a property as security for the payment of a debt or the performance of a duty. The "mortgagor" is the borrower who grants a mortgage in exchange for a loan; the "mortgagee" is the lender who gives the loan secured by the

6

mortgage. See Black's Law Dictionary 1031, 1034 (8th ed. 2004). The mortgagee is so well understood as the lender that Black's Law Dictionary defines a "foreclosure" as an action brought by the lender/mortgagee: a foreclosure is a "legal proceeding to terminate a mortgagor's interest in property, instituted by the lender (the mortgagee) either to gain title or to force a sale in order to satisfy the unpaid debt secured by the property." Black's Law Dictionary 674. Similarly, the tie between a mortgage and an underlying debt is so intrinsic that Kansas law provides that "[t]he assignment of any mortgage . . . shall carry with it the debt thereby secured." K.S.A. 58-2323. Indeed, an assignment of a mortgage without the debt transfers nothing. 55 Am. Jur. 2d, Mortgages § 1002. Thus, the mortgagee, who must have an interest in the debt, is the lender in a typical home mortgage.

But for reasons thought beneficial by a group of lenders who trade mortgages, the form of mortgage used in this case designates an entity that is *not* the lender as the mortgagee. See *MERSCORP, Inc. v. Romaine*, 8 N.Y.3d 90, 96, 828 N.Y.S.2d 266, 861 N.E.2d 81 (2006) (MERS was established by large lenders to allow easy electronic trading and tracking of mortgages). Specifically, the mortgage says that the mortgagee is MERS, though "solely as nominee for Lender." Does this mean that MERS really *was* the mortgagee, even though it didn't lend money or have any rights to loan repayments? Assuming so, MERS argues that it was a necessary party to the foreclosure and that the foreclosure must be set aside. But the premise upon which MERS bases this argument is flawed.

What is MERS's interest? MERS claims that it holds the title to the second mortgage, not the real estate. So it does, but only as a nominee. In terms of the roles that we've discussed in the mortgage business, MERS holds the mortgage but without rights to the debt. The district court found that MERS was merely an agent for the principal player, Millennia. While MERS objects to its characterization as an agent, it's a fair one.

MERS had no right to the underlying debt repayment secured by the mortgage; MERS did not even act as the servicing agent to receive the payments and remit them to the lender. MERS's right to act to enforce the mortgage was strictly limited: if "necessary to comply with law or custom," MERS could foreclose the mortgage or enter a release of the mortgage. MERS certainly could not act at odds to its principal, the lender. Its role fits the classic definition of an agent: one "'authorized by another to act for him, or intrusted with another's business.'" *In re Tax Appeal of Scholastic Book Clubs, Inc.*, 260 Kan. 528, 534, 920 P.2d 947 (1996) (quoting Black's Law Dictionary 85 [4th ed. 1968]).

Only one Kansas case has discussed the meaning of nominee in any detail. In *Thompson v. Meyers*, 211 Kan. 26, 30, 505 P.2d 680 (1973), the court noted that the meaning of the term may vary from a pure straw man or limited agent to one who has broader authority.

But whatever authority the nominee may have comes from the delegation of that authority by the principal. In its ordinary meaning, a nominee represents the principal in only a "nominal capacity" and does not receive any property or ownership rights of the person represented. See, *e.g., Cisco v. Van Lew*, 60 Cal. App. 2d 575, 583-84, 141 P.2d

7

433 (1943); see also *Applebaum v. Avaya, Inc.*, 812 A.2d 880, 889 (Del. 2002) (referring to nominees "as agents of the beneficial owners"). The Millennia mortgage does not purport to give MERS any greater rights than normally given a nominee. The mortgage says that MERS acts "solely as nominee for Lender." There is no express grant of any right to MERS to transfer or sell the mortgage or even to assign its duties as nominee. Nor does MERS obtain any right to the borrower's payments or even a role in receiving payments.

MERS and Sovereign correctly note that a foreclosure judgment may be set aside for failure to join a contingently necessary party. *E.g.*, *Wisconsin Finance v. Garlock*, 140 Wis. 2d 506, 512, 410 N.W.2d 649 (1987). For the purposes of our case, a party is contingently necessary under K.S.A. 60-219 if the party claims an interest in the property at issue and the party is so situated that resolution of the lawsuit without that party may "as a practical matter substantially impair or impede [its] ability to protect that interest." The real issue is that of the lender, the true mortgagee, to protect its security interest against the property. Whether MERS may act as a nominee for the lender, either to bring a foreclosure suit or for some other purpose, is not at issue in Landmark's foreclosure lawsuit. Moreover, an agent for a disclosed principal is not a necessary party to a lawsuit adjudicating the substantive rights of the principal. *Hotel Constructors, Inc. v. Seagrave Corp.*, 99 F.R.D. 591, 592 (S.D.N.Y. 1983); *Liles v. Winters Independent School District*, 326 S.W.2d 182, 188 (Tex. App. 1959).

In support of the necessary-party argument, MERS and Sovereign cite *Dugan v. First Nat'l Bank in Wichita*, 227 Kan. 201, 606 P.2d 1009 (1980). In *Dugan*, a bank agreed to act as escrow agent for three parties who loaned money and obtained a mortgage as collateral. The bank was to receive all repayments made on the various loans and then remit them to the lenders in the appropriate percentages; the bank was also the named mortgagee, apparently due to the multiple lenders who were separate actors. The court held that the bank and the lenders were all necessary parties to the lawsuit, in which the borrower sought reformation or cancellation of the mortgages based on fraud and breach-of-fiduciary-duty claims. The bank was a necessary party even though it had no direct financial interest in the loans and would "be affected only tangentially in its position as designated mortgagee and escrow agent." 227 Kan. at 212.

In response, Kesler cites *Moore v. Petroleum Building, Inc.* 164 Kan. 102, 187 P.2d 371 (1947). In *Moore*, a plaintiff had intervened in a past foreclosure action and later filed suit to enjoin a bank and escrow holder from delivering deeds to another party. The bank was used only to hold deeds that would be delivered upon termination of the leases and was not a party to the original foreclosure. The court held that the plaintiff should have raised issues regarding his rights under the escrow agreement in the previous foreclosure case, noting that "there probably was no necessity that [the bank] should have been made a party, for it stood by only as a custodian of the deeds and for no other purpose." 164 Kan. at 108.

We find *Moore* closer to our facts than *Dugan*. Like the bank in *Moore*, MERS did not receive any funds on behalf of Millennia or Sovereign. The mortgage set out clearly that

8

the borrower, Kesler, was to pay his monthly payments to the lender. The mortgage also suggests that the reputed mortgagee, MERS, was not interested in receiving notices of default. The Millennia mortgage, which was duly recorded in the public record, included a section titled "Request For Notice of Default and Foreclosure Under Superior Mortgages or Deeds of Trust." As the district court noted, that section provided that both "Borrower and Lender request" the holder of any mortgage with priority "give Notice to Lender, at Lender's address set forth on page one of this Mortgage, of any default . . . and of any sale or other foreclosure action." Millennia's address was noted on page one of the mortgage; the mortgage did not list MERS as an entity to contact upon default or foreclosure.

Two older Kansas cases should also be noted, though the parties didn't cite them. In *Swenney v. Hill*, 65 Kan. 826, 70 P. 868 (1902), the court faced a situation somewhat different than today's typical residential-mortgage. As part of the same transaction, a couple borrowed money and then gave mortgage bonds to two individuals and a mortgage to an investment company. Repayment of the loan was made to the bondholders, but the mortgagee/investment company had "extensive rights and active powers over the relationship" between the borrowers and the bondholders. 65 Kan. at 828. While the court did not concern itself with why this structure had been chosen, it determined that the mortgagee/investment company was a necessary party because it had a right under the written agreements to advance additional funds, thus increasing the amount of the lien, as well as the right to declare the loan matured and bring suit. In addition, the mortgage could not be released by the bondholders alone; the mortgagee/investment company was also required to approve it. We do not know from the court's opinion whether the investment company organized the transaction initially or made any guarantee of repayment to the bondholders, but the court said that the investment company had "substantial rights and interests." 65 Kan. at 829.

A second relevant case is *Gibson v. Ledwitch*, 84 Kan. 505, 114 P. 851 (1911). It involved the converse of our case--a party sued to quiet title against a mortgage, which would clear the title from the encumbrance of that mortgage. But the plaintiff joined only a trustee who had no beneficial interest in that mortgage; the beneficial owner was not made a party. The court held that the judgment did not bind the beneficial holder of the mortgage since the trustee had no right to the payments, was not the party to declare default, and had no authority to transfer or foreclose the mortgage.

We also believe that the decisions in *Swenney* and *Gibson* are supportive of the result here. MERS does not have the sort of "substantial rights and interests" that the investment company had in *Swenney*. MERS points to its ability to foreclose or to release the mortgage, authority provided in the mortgage "if necessary to comply with law or custom." Kansas law does require through K.S.A. 58-2309a that a mortgage holder promptly release a mortgage when the debt has been paid; MERS could be required as a matter of law to file a mortgage release after a borrower proved that the debt had been paid. Other than that, however, it is hard to conceive of another act that MERS--instead of the lender--would be required to take by law or custom. And although *Gibson* involves

9

the converse of our case, it suggests that a party with no beneficial interest is outside the realm of necessary parties.

In addition to the claim that MERS was a necessary party under K.S.A. 60-219, MERS and Sovereign also argue that the failure to include MERS violated its due process rights. But MERS had no direct property interests at stake; even its right to act on behalf of its principal was not at issue in Landmark's suit. Without a property interest at stake, there can be no due process violation. *State ex rel. Tomasic v. Unified Gov't of Wyandotte County/Kansas City*, 265 Kan. 779, 809, 962 P.2d 543 (1998).

We do not attempt in this opinion to comprehensively determine all of the rights or duties of MERS as a nominee mortgagee. As the mortgage suggests may be done when "necessary to comply with law or custom," courts elsewhere have found that MERS may in some cases bring foreclosure suits in its own name. *Mortgage Electronic Registration v. Azize*, 965 So. 2d 151 (Fla. Dist. App. 2007). On the other hand, some have suggested potential problems created by MERS's practices, *MERSCORP, Inc. v. Romaine*, 8 N.Y.3d 90, 100-04, 828 N.Y.S.2d 266, 861 N.E.2d 81 (2006) (Kaye, C.J., dissenting), or with the handling of paperwork documenting who owns what in the residential-mortgage industry in general. *E.g., In re Nosek*, 386 B.R. 374, 385 (Bankr. D. Mass. 2008); *In re Foreclosure Cases*, 2007 WL 3232430 (N.D. Ohio 2007) (unpublished opinion). In this case, we are only required to address whether the failure to name and serve MERS as a defendant in a foreclosure action in which the lender of record has been served is such a fatal defect that the foreclosure judgment must be set aside. We hold that it is not.

II. *The District Court Did Not Abuse Its Discretion by Denying Motions of MERS and Sovereign to Intervene After the Judgment Had Been Entered.*

Neither MERS nor Sovereign argue that Landmark was required to join Sovereign. But both MERS and Sovereign argue that the district court wrongly denied their motions to intervene.

On this argument they face a major hurdle: the Kansas Supreme Court has held that there is no jurisdiction even to consider a motion to intervene made after the entry of judgment and the expiration of the 10-day period for filing new-trial motions. *Smith v. Russell*, 274 Kan. 1076, Syl. ¶ 4, 58 P.3d 698 (2002). Even so, timeliness is to be determined from the specific circumstances of each case. See *Mohr v. State Bank of Stanley*, 244 Kan. 555, 562, 770 P.2d 466 (1989). Although some caselaw allows intervention after judgment "where it is necessary to preserve some right which cannot otherwise be protected," these authorities generally have allowed intervention so that there would be appropriate representation in an appeal when a party that originally participated in the case is no longer adequately representing the intervenor's interest. *E.g., Hukle v. City of Kansas City*, 212 Kan. 627, 631-32, 512 P.2d 457 (1973). Of course, that's not our situation.

The intervention argument faces another hurdle too: the decision whether to permit intervention may be reversed only when no reasonable person could agree with the district court's decision. See *Mohr*, 244 Kan. at 561-62; *Farmers Group, Inc. v. Lee*, 29

Kan. App. 2d 382, 385, 28 P.3d 413 (2001). Sovereign's motion to intervene was filed 76 days after foreclosure, 53 days after the court ordered the property sold, and 26 days after the property was sold. MERS's motion to intervene was filed 134 days after foreclosure, 111 days after the court ordered the property sold, and 84 days after the property was sold. Especially in light of *Smith*'s holding that a court lacked jurisdiction when the motion to intervene came after the 10-day period for filing new-trial motions, we believe it would be extremely difficult--even if the district court had jurisdiction to grant intervention--to reverse for an abuse of discretion on motions filed as far after judgment as those of Sovereign and MERS.

MERS and Sovereign argue that their intervention motions were timely because the time for filing an appeal had not yet run. They base this argument on a claim that the time to file an appeal doesn't begin until the sheriff's sale of the property is confirmed. But a judgment of foreclosure is a final judgment for appeal purposes when it determines the rights of the parties, the amounts to be paid, and the priority of claims. *Stauth v. Brown*, 241 Kan. 1, 6, 734 P.2d 1063 (1987). The foreclosure judgment in this case did so. We find no abuse of discretion in denying intervention.

III. *Separate Claims by Kesler and Other Parties Are Not Properly Raised on Appeal.*

Dennis Bristow and Tony Woydziak, who together bought the property at a sheriff's sale, have sought to proceed with Kesler on a cross-appeal to challenge the district court's orders enjoining them from finalizing sale of the property while the appeal was heard. They also seek a ruling that Sovereign is bound by the district court's judgment.

Kesler, Bristow, and Woydziak raise issues that are not based on the same judgments on which MERS and Sovereign have filed their appeal. The joint notice of appeal from MERS and Sovereign noted an appeal from "(1) Journal Entry of Judgment filed September 6, 2006; (2) Order filed January 18, 2007; (3) Supplemental Order filed January 18, 2007; and (4) Order Denying Motions for Reconsideration filed March 22, 2007." But Kesler, Bristow, and Woydziak attempted to include a separate district court decision, entered May 2, 2007, which had denied their motions to dismiss for lack of jurisdiction the motions to intervene by MERS and Sovereign and also granted a stay pending appeal to MERS and Sovereign. A cross-appeal must involve the same judgment as the underlying appeal, but Kesler, Bristow, and Woydziak argue a separate issue from a different district court order.

Even if the same judgment were involved, notice of a cross-appeal must be filed within 20 days of the notice of appeal. MERS and Sovereign filed their joint notice of appeal on March 28, 2007; Kesler, Bristow, and Woydziak did not seek to file a cross-appeal within 20 days of that date.

This court is without jurisdiction to address the separate issues raised on appeal by Kesler, Bristow, and Woydziak.

*Conclusion*

The district court properly determined that MERS was not a contingently necessary party in Landmark's foreclosure action. The district court also was well within its discretion in denying motions from MERS and Sovereign to intervene after a foreclosure judgment had been entered and the foreclosed property had been sold. The judgment of the district court is affirmed.

BANKRUPTCY COURT OF THE UNITED STATES
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------- X

IN RE SUZAN ROBERTA ABBOTT       CASE No. 09 37125- cgm

                                                          Chapter 7

---------------------------------------------------- X

## Verified Certificate of Mailing

I certify that on this 22 day of September 2009 I served the enclosed;

**NOTICE OF HEARING AND MOTION TO CERTIFY QUESTIONS SEPTEMBER 22, 2009, with SUPPLEMENTAL JUDICIAL NOTICE REQUESTED OF DECISION RENDERD IN *Landmark National Bank v. Kesler*, 2009 Kan. LEXIS 834 Appeal NO. 98,489 WITH THE AFFIDAVIT IN SUPPORT & PROPOSED ORDER**

By First class mail with postage affixed and fully prepaid to:

Paul L. Banner, Trustee              United States Trustee
515 Haight Avenue                 74 Chapel Street
Second Floor, Suite A            Albany, N.Y. 12207
Poughkeepsie, New York, 12603

Druckman Law GROUP PLLC
ATTORNEYS FOR PLAINTIFF
Attn: Kiyam J. Poulson
242 Drexel Avenue
Westbury, New York 11590


I declare under penalty of perjury that the forging is true and correct and was executed at White Lake New York.

                                                   SUZAN R. ABBOTT

# LANDMARK DECISION PROMISES MASSIVE RELIEF FOR HOMEOWNERS AND TROUBLE FOR BANKS

Ellen Brown, September 19th, 2009
http://www.webofdebt.com/articles/mers.php

RECEIVED SEP 2 2 2009 U.S. BANKRUPTCY COURT

A landmark ruling in a recent Kansas Supreme Court case may have given millions of distressed homeowners the legal leverage they need to avoid foreclosure. In *Landmark National Bank v. Kesler*, 2009 Kan. LEXIS 834, the Kansas Supreme Court held that a nominee company called MERS has no right or standing to bring an action for foreclosure. MERS is an acronym for Mortgage Electronic Registration Systems, a private company that registers mortgages electronically and tracks changes in ownership. The significance of the holding is that if MERS has no standing to foreclose, then *nobody* has standing to foreclose – on 60 million mortgages. That is the number of American mortgages currently reported to be held by MERS. Over half of all new U.S. residential mortgage loans are registered with MERS and recorded in its name. Holdings of the Kansas Supreme Court are not binding on the rest of the country, but they are dicta of which other courts take note; and the reasoning behind the decision is sound.

## Eliminating the "Straw Man" Shielding Lenders and Investors from Liability

The development of "electronic" mortgages managed by MERS went hand in hand with the "securitization" of mortgage loans – chopping them into pieces and selling them off to investors. In the heyday of mortgage securitizations, before investors got wise to their risks, lenders would slice up loans, bundle them into "financial products" called "collateralized debt obligations" (CDOs), ostensibly insure them against default by wrapping them in derivatives called "credit default swaps," and sell them to pension funds, municipal funds, foreign investment funds, and so forth. There were many secured parties, and the pieces kept changing hands; but MERS supposedly kept track of all these changes electronically. MERS would register and record mortgage loans in its name, and it would bring foreclosure actions in its name. MERS not only facilitated the rapid turnover of mortgages and mortgage-backed securities, but it has served as a sort of "corporate shield" that protects investors from claims by borrowers concerning predatory lending practices. California attorney Timothy McCandless describes the problem like this:

"[MERS] has reduced transparency in the mortgage market in two ways. First, consumers and their counsel can no longer turn to the public recording systems to learn the identity of the holder of their note. Today, county recording systems are increasingly full of one meaningless name, MERS, repeated over and over again. But more importantly, all across the country, MERS now brings foreclosure proceedings in its own name – even though it is not the financial party in interest. This is problematic because MERS is not prepared for or equipped to provide responses to consumers' discovery requests with respect to predatory lending claims and defenses. In effect, the securitization conduit attempts to use a faceless and seemingly innocent proxy with no knowledge of predatory origination or servicing behavior to do the dirty work of seizing the consumer's home. . . . So imposing is this opaque corporate wall, that in a "vast" number of foreclosures, MERS actually succeeds in foreclosing without producing the original note – the legal sine qua non of foreclosure – much less documentation that could support predatory lending defenses."

The real parties in interest concealed behind MERS have been made so faceless, however, that there is now no party with standing to foreclose. The Kansas Supreme Court stated that MERS' relationship "is *more akin to that of a straw man* than to a party possessing all the rights given a buyer." The court opined:

"By statute, assignment of the mortgage carries with it the assignment of the debt. . . . Indeed, in the event that a mortgage loan somehow separates interests of the note and the deed of trust, with the deed of trust lying with some independent entity, the mortgage may become unenforceable. *The practical effect of splitting the deed of trust from the promissory note is to make it impossible for the holder of the note to foreclose, unless the holder of the deed of trust is the agent of the holder of the note.* Without the agency relationship, the person holding only the note lacks the power to foreclose in the event of default. The person holding only the deed of trust will never experience default because only the holder of the note is entitled to payment of the underlying obligation. *The mortgage loan becomes ineffectual when the note holder did not also hold the deed of trust.*" [Citations omitted; emphasis added.]

MERS as straw man lacks standing to foreclose, but so does original lender, although it was a signatory to the deal. The lender lacks standing because title had to pass to the secured parties for the arrangement to legally qualify as a "security." The lender has been paid in full and has no further legal interest in the claim. Only the securities holders have skin in the game; but they have no standing to foreclose, because they were not signatories to the original agreement. They cannot satisfy the basic requirement of contract law that a plaintiff suing on a written contract must produce a signed contract proving he is entitled to relief.

## The Potential Impact of 60 Million Fatally Flawed Mortgages

The banks arranging these mortgage-backed securities have typically served as trustees for the investors. When the trustees could not present timely written proof of ownership entitling them to foreclose, they would in the past file "lost-note affidavits" with the court; and judges usually let these foreclosures proceed without objection. But in October 2007, an intrepid federal judge in Cleveland put a halt to the practice. U.S. District Court Judge Christopher Boyko ruled that Deutsche Bank had not filed the proper paperwork to establish its right to foreclose on fourteen homes it was suing to repossess as trustee. Judges in many other states then came out with similar rulings.

Following the Boyko decision, in December 2007 attorney Sean Olender suggested in an article in *The San Francisco Chronicle* that the real reason for the bailout schemes being proposed by then-Treasury Secretary Henry Paulson was not to keep strapped borrowers in their homes so much as to stave off a spate of lawsuits against the banks. Olender wrote:

"The sole goal of the [bailout schemes] is to prevent owners of mortgage-backed securities, many of them foreigners, from suing U.S. banks and forcing them to buy back worthless mortgage securities at face value – right now almost 10 times their market worth. The ticking time bomb in the U.S. banking system is not resetting subprime mortgage rates. The real problem is the contractual ability of investors in mortgage bonds to require banks to buy back the loans at face value if there was fraud in the origination process.

". . . The catastrophic consequences of bond investors forcing originators to buy back loans at face value are beyond the current media discussion. *The loans at issue dwarf the capital available at the largest U.S. banks combined, and investor lawsuits would raise stunning liability sufficient to cause even the largest U.S. banks to fail, resulting in massive taxpayer-funded bailouts of Fannie and Freddie, and even FDIC . . . .*

"What would be prudent and logical is for the banks that sold this toxic waste to buy it back and for a lot of people to go to prison. If they knew about the fraud, they should have to buy the bonds back."

Needless to say, however, the banks did not buy back their toxic waste, and no bank officials went to jail. As Olender predicted, in the fall of 2008, massive taxpayer-funded bailouts of Fannie and Freddie were pushed through by Henry Paulson, whose former firm Goldman Sachs was an active player in creating CDOs when he was at its helm as CEO. Paulson also hastily engineered the $85 billion bailout of insurer American International Group (AIG), a major counterparty to Goldmans' massive holdings of CDOs. The insolvency of AIG was a huge crisis for Goldman, a principal beneficiary of the AIG bailout.

In a December 2007 *New York Times* article titled "The Long and Short of It at Goldman Sachs," Ben Stein wrote:

"For decades now, . . . I have been receiving letters [warning] me about the dangers of a secret government running the world . . . . [T]he closest I have recently seen to such a world-running body would have to be a certain large investment bank, whose alums are routinely Treasury secretaries, high advisers to presidents, and occasionally a governor or United States senator."

The pirates seem to have captured the ship, and until now there has been no one to stop them. But 60 million mortgages with fatal defects in title could give aggrieved homeowners and securities holders the crowbar they need to exert some serious leverage on Congress – serious enough perhaps even to pry the legislature loose from the powerful banking lobbies that now hold it in thrall.

Ellen Brown developed her research skills as an attorney practicing civil litigation in Los Angeles. In Web of Debt, her latest book, she turns those skills to an analysis of the Federal Reserve and "the money trust." She shows how this private cartel has usurped the power to create money from the people themselves, and how we the people can get it back. Her earlier books focused on the pharmaceutical cartel that gets its power from "the money trust." Her eleven books include Forbidden Medicine, Nature's Pharmacy (co-authored with Dr. Lynne Walker), and The Key to Ultimate Health (co-authored with Dr. Richard Hansen). Her websites are www.webofdebt.com and www.ellenbrown.com.

Home | Also by Ellen Brown | Links | Contact Us | Order Now   SHARE

Site by Phoenix Development.
© Copyright 2007 Ellen Brown. All Rights Reserved.